UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| DONALD EAST,<br><br>Plaintiff,<br><br>vs.<br><br>MINNEHAHA COUNTY, CORRECT CARE SOLUTIONS, LLC; JEAN HEISLER, M.D.; LINDA OSBORNE; ROBERT DOOLEY, WARDEN; BRIAN FOLEY; MICHAEL HANVEY; BRADLEY ADAMS; and JOHN DOES 1 AND 2,<br><br>Defendants. | 4:16-CV-04122-RAL<br><br><br>OPINION AND ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT AND TO DISMISS |

Plaintiff Donald East, an indigent inmate in state custody, started this case with a complaint filed August 29, 2016. Doc. 1. East first amended his complaint in October of 2016. Doc. 10. Thereafter, on October 13, 2016, this Court screened the case under 28 U.S.C. § 1915A, dismissed certain negligence claims, but concluded that East had stated a claim under the Eighth Amendment of the United States Constitution and based on 42 U.S.C. § 1983 for deliberate indifference to East's serious medical needs in connection with a minor toe injury leading to removal of a toe and additional surgery and foot issues. Doc. 11. East's case progressed slowly afterward with this Court initially denying appointment of counsel and East continually seeking to amend his complaint and to have appointment of counsel. In April of 2017, this Court issued an Opinion and Order granting amendment of the complaint, but dismissing certain claims and parties and directing East to complete summons forms so that Defendants could be served. Doc. 20. East

1

continued to seek to amend the complaint, have counsel appointed, and did not complete and return the summons forms. See Doc. 40. Because East appeared to have colorable claims under § 1983 and because it had become apparent that East lacked the capacity to adequately investigate and present his claims without counsel, this Court appointed counsel for East in January of 2018. Doc. 40. The appointed counsel has performed admirably for East, filing a comprehensive second amended complaint, Doc. 47, which named as Defendants Minnehaha County, Correct Care Solutions, LLC (CCS), Jean Heisler, M.D. (Dr. Heisler), Linda Osborne (Nurse Osborne), Mike Durfee State Prison Warden Robert Dooley (Warden Dooley), Mike Durfee State Prison Unit Coordinator Brian Foley (Coordinator Foley), two physician assistants who provided service at Mike Durfee State Prison named Michael Hanvey (PA Hanvey) and Bradley Adams (PA Adams), and two unknown correctional officers at Mike Durfee State Prison denoted as John Does 1 and 2. John Does 1 and 2 appear to be corrections officers Jeremy Baker and Adam Goins. Doc. 90 at ¶ 30.

PA Adams filed a motion to dismiss, Doc. 63, arguing that the most recent amended complaint failed to state a claim against him. PA Adams noted that only Paragraphs 57 and 73 of that complaint mention his conduct, and he, unlike other Defendants, treated East sparingly. Docs. 64, 84. East opposed PA Adams' motion to dismiss. Doc. 80.

All of the other Defendants (except Minnehaha County) have filed motions for summary judgment. Defendants Warden Dooley, Coordinator Foley, PA Hanvey, Baker, and Goins (collectively the Mike Durfee State Prison Defendants) seek summary judgment based on qualified immunity and the absence of liability. Docs. 68, 69. The Mike Durfee State Prison Defendants also filed a motion for protective order to cease discovery pending decision on the qualified immunity issue. Doc. 77. East opposed these motions. Doc. 87. Dr. Heisler filed a motion for

summary judgment arguing that the three-year statute of limitations on claims against her had run and that she had not been deliberately indifferent to any serious medical need of East. Docs. 106, 107, 123. Separately CCS filed a motion for summary judgment with the same arguments as made by Dr. Heisler, Doc. 117, but submitting that CCS employee and co-defendant Nurse Osborne had not been served. Doc. 120. East opposed those motions for summary judgment as well. Docs. 114, 127. For the reasons explained herein, this Court grants the motions for summary judgment and the motion to dismiss.

## I.     Motion to Dismiss and Motion for Summary Judgment Standards.

PA Adams has filed a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Doc. 63. On a motion to dismiss under Rule 12(b)(6), the court must accept a plaintiff's factual allegations as true and make all inferences in the plaintiff's favor, but need not accept a plaintiff's legal conclusions. Retro Television Network, Inc. v. Luken Commc'ns, LLC, 696 F.3d 766, 768−69 (8th Cir. 2012). To survive a motion to dismiss for failure to state a claim, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although detailed factual allegations are unnecessary, the plaintiff must plead enough facts to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," id., "even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that recovery is very remote and unlikely,'" Twombly, 550 U.S. at 556 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). Still, "conclusory statements" and "naked assertion[s] devoid

of further factual enhancement" do not satisfy the plausibility standard.[1] Iqbal, 556 U.S. at 678 (alteration in original) (citation and internal marks omitted).

Defendants, other than PA Adams and Minnehaha County, have filed summary judgment motions. Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56(a) places the burden initially on the moving party to establish the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). Once the moving party has met that burden, the nonmoving party must establish that a material fact is genuinely disputed either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A), (B); Gacek v. Owens & Minor Distribution, Inc., 666 F.3d 1142, 1145–46 (8th Cir. 2012); see also Mosley v. City of Northwoods, 415 F.3d 908, 910 (8th Cir. 2005) (stating that nonmovant may not merely rely on allegations or denials). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in his pleading, but must set forth specific facts showing that there is a genuine issue for trial. Gacek, 666 F.3d at 1145. In ruling on a motion for summary judgment,

---

[1] East's initial complaint was filed pro se, and interpretation of the allegations in that initial complaint matters to a statute of limitations argument made by Dr. Heisler and CCS. The Eighth Circuit requires district courts to construe pro se complaints liberally. Stone v. Harry, 364 F.3d 912, 914 (8th Cir. 2004). This means "that if the essence of an allegation is discernible, even though it is not pleaded with legal nicety, then the district court should construe the complaint in a way that permits the layperson's claim to be considered within the proper legal framework." Id. at 915. Importantly, however, this rule of liberal construction does not excuse a pro se plaintiff from alleging enough facts to support his claims. Id. at 914. That is, even though a plaintiff is proceeding pro se, the district court will not "assume facts that are not alleged, just because an additional factual allegation would have formed a stronger complaint." Id. at 915.

the facts and inferences fairly drawn from those facts are "viewed in the light most favorable to the party opposing the motion." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587–88 (1986) (quoting <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962) (per curiam)).

## II. Facts Not Subject to Genuine Dispute.[2]

### A. Treatment of East at Minnehaha County Jail.

East was incarcerated and housed at the Minnehaha County Jail in Sioux Falls, South Dakota, pending trial on state criminal charges. His stay at the Minnehaha County Jail began on or about July 2, 2012, and lasted through on or about February 14, 2014, at which time he was transferred to the care and custody of the South Dakota Department of Corrections and then incarcerated at Mike Durfee State Prison. Doc. 61 at ¶ 3; Doc. 118 at ¶ 1; Doc. 128 at ¶ 1. Defendant Minnehaha County contracted with Defendant CCS to provide medical care and treatment at the Minnehaha County Jail during the time when East was incarcerated and housed at that facility. Doc. 61 at ¶ 4; Doc. 118 at ¶ 2; Doc. 128 at ¶ 2. Defendant Nurse Osborne was employed as a nurse by CCS during the time that East was incarcerated at the Minnehaha County Jail. Doc. 61 at ¶ 5; Doc. 118 at ¶ 4; Doc. 128 at ¶ 4. Defendant Dr. Heisler was employed with Center for Family Medicine, which was contracted by CCS to provide periodic medical care to inmates at the Minnehaha County Jail. Doc. 119 at ¶¶ 2–5; Doc. 113 at ¶¶ 4–6.

East's foot issues appear to have begun in early April of 2013. On Saturday, April 6, 2013, East submitted a "kite"[3] reporting a problem with his right foot and requesting to be seen by a nurse or doctor. Doc. 109 at ¶ 8; Doc. 113 at ¶ 10; Doc. 128 at ¶ 19. A nurse visited East at the

---

[2] This Court takes the facts primarily from those portions of the Defendants' Statements of Material Fact not being disputed by East. The facts concerning the claims against PA Adams are taken from the most recent amended complaint.

[3] A "kite" is a formal request by an inmate for services or relief.

Minnehaha County Jail that same day and observed him to have two open wounds on the bottom of his foot, and East was scheduled to see a doctor then the next Monday, April 8, 2013. Doc. 109 at ¶ 8; Doc. 113 at ¶ 10; Doc. 128 at ¶ 19.

On April 8, 2013, Dr. Heisler saw East and observed him to have two open three-millimeter lesions on the ball of his right foot surrounded by callouses. Dr. Heisler thought that East had dug at blisters such that they were now open, although East did not do so. Dr. Heisler observed no redness or drainage. Dr. Heisler directed CCS staff to clean and dress the wounds on a daily basis, but East recalls that CCS did not do so until April 14, 2013. Doc. 109 at ¶ 8; Doc. 113 at ¶ 11; Doc. 128 at ¶ 20.

In mid-April of 2013, a medical resident working under Dr. Heisler at Center for Family Medicine communicated with CCS staff and ordered Cephalexin/Keflex[4] for East. That treatment then was administered by CCS staff twice daily to help healing and to address possible infection. Doc. 109 at ¶ 8; Doc. 113 at ¶ 12; Doc. 128 at ¶ 21. From April 14 through April 28, 2013, CCS documented providing almost daily wound care to East, including, but not limited to, unwrapping, observing, cleaning, and treating with triple antibiotic ointment, petroleum, or a 50/50 mix of hydrogen peroxide and water, and covering the blistered area of the foot at least once daily. Doc. 109 at ¶ 8; Doc. 113 at ¶ 13; Doc. 128 at ¶ 22.

A certified nurse practitioner under Dr. Heisler's supervision communicated with CCS staff about East and ordered another round of the Cephalexin/Keflex, which CCS staff then administered to East three times daily between April 25 and May 5, 2013, to help healing and to address possible infection. Doc. 109 at ¶ 8; Doc. 113 at ¶ 14; Doc. 128 at ¶ 23. Between April 29 and May 5, 2013, CCS staff continued to document providing almost daily wound care to East,

---

[4] Keflex is a brand name for the oral antibiotic pill whose generic name is Cephalexin.

including unwrapping, observing, cleaning, treating, and covering the blistered area of East's foot. Doc. 109 at ¶ 8; Doc. 113 at ¶ 15; Doc. 128 at ¶ 24.

On May 6 and 7, 2013, Dr. Heisler examined East's foot during wound care checks. Despite the two courses of antibiotics that had been administered, the lesions on the foot had grown to quarter size. East's foot wounds had been draining, had a foul smell, and appeared to change from white or pink to being more red. Doc. 113 at ¶ 16; Doc. 128 at ¶ 25. Between May 8 and May 21, 2013, CCS staff continued to document daily wound care to East, again including unwrapping, observing, cleaning, and treating with triple antibiotic ointment, petroleum, or a 50/50 mix of hydrogen peroxide and water, and covering the area daily. However, East did not receive wound care on April 25 or on May 8 or 9, 2013. Doc. 113 at ¶ 17; Doc. 128 at ¶ 26.

A medical resident working at the Center for Family Medicine under Dr. Heisler's supervision communicated with CCS staff on or about May 22, 2013, to order Clindamycin[5] for East. CCS staff then administered Clindamycin three times daily to East to address infection issues from May 22 through May 29, 2013. By this point there was a concern about East's toe having cellulitis, which is a spreading bacterial infection of the skin and subcutaneous tissues. Doc. 113 at ¶ 18; Doc. 128 at ¶ 27. The medical resident did the daily cleaning of East's wound so that it could be examined on May 24, 2013, as a part of the ongoing daily wound care being provided. Doc. 113 at ¶¶ 19−20; Doc. 128 at ¶¶ 28−29. From May 25 through June 18, 2013, CCS staff continued to provide the daily wound care, including unwrapping, observing, cleaning, and treating with triple antibiotic ointment, petroleum, or a 50/50 mix of hydrogen peroxide and water, and covering the infected area. Doc. 113 at ¶ 21; Doc. 128 at ¶ 30.

---

[5] Clindamycin is a different oral antibiotic.

During this time, on or about June 7, a medical intern working under Dr. Heisler communicated with CCS staff to order a different antibiotic, Bactrim, which was then administered twice per day to East by CCS staff. Doc. 113 at ¶ 22; Doc. 128 at ¶ 31. The intern's records reflected a worsening of East's condition, now characterized as foot cellulitis as of June 7, 2013. Doc. 113 at ¶ 22; Doc. 128 at ¶ 31.

On June 12, 2013, Dr. Heisler evaluated East after his foot had been cleaned. Dr. Heisler noted East's history of antibiotic treatment and observed that the wound on the bottom of his right lateral foot was tracking into the proximal foot a little. This tracking indicated to Dr. Heisler that there was potential for a deeper infection than what had previously been observed by her and others up to that point. Doc. 109 at ¶ 8; Doc. 113 at ¶ 23; Doc. 128 at ¶ 32. Dr. Heisler ordered daily wound care change to include irrigation with peroxide, together with a change in shoes, to help the wound heal. Dr. Heisler informed CCS staff that she wanted to see East again in three weeks and recorded in her progress notes to consider wound care referral if East had not improved in that time on the wound care regimen and Bactrim antibiotic. Doc. 109 at ¶ 8; Doc. 113 at ¶ 24.

Between June 19 and July 10, 2013, CCS staff continued to provide the daily wound care of unwrapping, observing, cleaning, and treating East's foot at least once daily. Doc. 109 at ¶ 8; Doc. 113 at ¶ 25; Doc. 128 at ¶ 33. Around this time, a nurse told East that he needed to go to the hospital because his foot was badly infected, but that she could do nothing more for East because Dr. Heisler was her superior. On June 22, 2013, East filed a grievance when he did not receive wound care on that day. The sheets documenting the wound care suggest that East's wound fluctuated in color and depth, sometimes being described as pink and then "black hard" and then "red/white." On July 4 and 5, 2013, medical staff documented a foul odor from the wound. Doc. 113 at ¶ 26; Doc. 128 at ¶ 34.

On July 9, 2013, Dr. Heisler rechecked East's wound, apparently thought it was improving, and ordered a change in the type of gauze with the dressing to be removed at night to let the wound air out. Dr. Heisler planned to see East in another two or three weeks. Doc. 109 at ¶ 8; Doc. 113 at ¶ 26; Doc. 128 at ¶ 34. From July 11 through July 23, 2013, CCS staff continued to provide the daily wound care of unwrapping, observing, cleaning, and treating the foot at least once daily. Doc. 113 at ¶ 28; Doc. 128 at ¶ 35.

On July 23, 2013, Dr. Heisler rechecked the wound, noting a seven-millimeter hardened scar around the ulcer that seemed to be preventing healing. Dr. Heisler ordered six more weeks of treatment and daily cleaning, with plans to trim the callous to help the healing process if there was no improvement. Doc. 113 at ¶ 31; Doc. 128 at ¶ 37. From July 23 to August 5, 2013, CCS continued to provide the daily wound care. Doc. 113 at ¶ 32; Doc. 128 at ¶ 38.

On August 7, 2013, a certified nurse practitioner under Dr. Heisler's supervision examined East's foot and noted an "acute onset of edema" and "decreased sensation [in the] foot." The nurse practitioner recorded that East was "unable to differentiate soft/hard touch on sole, dorsal surface." The nurse practitioner observed a nickel-sized lesion and mild erythema and "suspected" an ascending infection. Doc. 113 at ¶ 33; Doc. 128 at ¶ 39. The nurse practitioner ordered a new round of Bactrim to treat possible infection. The same nurse practitioner did a follow-up examination on East on August 9, 2013, believing the wound to have improved. However, the wound care flow sheets at this time noted a moderate yellow discharge and no diminishment in the size of the wound. Doc. 113 at ¶ 34; Doc. 128 at ¶ 40. Between August 6 and August 12, 2013, CCS staff continued to document the daily wound care consistent with what had been done throughout much of the summer of 2013. Doc. 113 at ¶ 35; Doc. 128 at ¶ 41.

On August 12, 2013, a Center for Family Medicine medical resident working under Dr. Heisler examined East and noted that the ulcer was "getting better on Bactrim." Although the physician thought the wound was stable, the length of time that the wound was taking to heal prompted continuing Bactrim and scheduling East for the wound clinic. Doc. 113 at ¶ 36; Doc. 128 at ¶ 42. On August 15, 2013, Dr. Heisler ordered an x-ray of East's foot, which was taken on August 16, 2013. An outside provider read the x-ray as showing possible osteomyelitis (infection of the bone) of East's fifth metatarsal. Doc. 113 at ¶ 37; Doc. 128 at ¶ 43. Dr. Heisler evidently was surprised to learn of the osteomyelitis discovered by the x-ray, as that condition was far more serious than what Dr. Heisler thought she was treating.

Because of the radiologist's concern of possible osteomyelitis, Dr. Heisler and others scheduled visits for East to see various specialists, including a wound care specialist, an infectious disease specialist, and an orthopedic physician. Doc. 113 at ¶ 41; Doc. 128 at ¶ 47. Those specialists took over care of East's foot beginning on August 20, 2013, although CCS staff continued to do the almost daily wound care from August 22 through September 24, 2013. Doc. 128 at ¶¶ 49−50. On August 31, 2013, East submitted a kite stating that he did not want to go to Avera McKennan Hospital for treatment of his foot because it felt fine, the wound was healed, and he was going to be leaving the Minnehaha County Jail soon. Doc. 128 at ¶ 51. East asserts that he first became aware of the true seriousness of his condition, and thus his § 1983 cause of action accrued against Dr. Heisler and CCS, on September 4, 2013. Doc. 114 at 3. After further testing, the orthopedic surgeon recommended amputating East's small toe, which was performed on September 24, 2013. Doc. 113 at ¶ 42; Doc. 128 at ¶ 49.

Between April of 2013 and mid-August of 2013, East was treated for wound care almost daily by CCS nursing staff. Doc. 128 at ¶ 52. During that same time frame of April 2013

through mid-August of 2013, at least five different physicians or nurse practitioners, including Dr. Heisler, either examined or entered orders for East's care. Doc. 128 at ¶ 53. In that time frame of April of 2013 through mid-August of 2013, East was treated by a physician or a nurse practitioner on at least fourteen different occasions. Doc. 128 at ¶ 54.

East was hospitalized at Avera McKennan Hospital for the toe amputation surgery from September 24 through September 30, 2013. He returned to the custody of the Minnehaha County Jail on September 30, 2013, where Nurse Osborne was involved in East's post-surgical care. Doc. 128 at ¶ 62. After his discharge from the hospital, a Center for Family Medicine physician supervised by Dr. Heisler ordered Norco[6] discontinued, and East experienced a delay of more than eight hours after his hospital-prescribed pain medication had been discontinued until Tylenol was administered. East's physician ordered laboratory tests to be done periodically and for Daptomycin[7] by IV for six weeks, Ceftriaxone[8] by IV daily for six weeks. East's PICC line was ordered flushed every day with Heparin (an anticoagulant), changes to the site dressing every week, and no blood draws from the arm in which the PICC line was placed. East was placed in medical observation housing within the Minnehaha County Jail. Doc. 128 at ¶ 62. East maintains that CCS personnel were not complying with orders and proper procedure for maintenance of the PICC line and points to the records not indicating that the PICC line site dressing was dressed weekly as ordered. Doc. 128 at ¶ 63.

On October 2, 2013, a nurse practitioner ordered Ibuprofen three times per day to control East's pain. Doc. 128 at ¶ 63. When East had a surgery follow-up with the orthopedic surgeon on

---

[6] Norco is a brand name for hydrocodone/acetaminophen, which is an opioid and non-opioid combination designed to relieve moderate to severe pain. East had received Norco when hospitalized.

[7] Daptomycin is an antibiotic used to treat systemic and life-threatening infections.

[8] Ceftriaxone is used to treat bacterial infections.

October 6 or 7, 2013, the surgeon ordered a hard sole shoe, indicated that it was okay for East to take Tylenol and Ibuprofen as needed for pain, and directed follow-up as needed. Doc. 128 at ¶ 64.

On October 8, 2013, East submitted a kite reporting pain in the location of his PICC line and requested to see a nurse. Although the nurse wrote "urgent" on the kite and stamped it October 9, 2013, no nurse saw East until October 10, 2013, at 4:30 a.m. Doc. 128 at ¶ 65. On October 10, 2013, East was transferred to Avera McKennan Hospital's emergency room for evaluation. Doc. 128 at ¶ 66. An infectious disease physician evaluated East at the hospital and determined that the current PICC line should be removed and replaced with a new line at a different site, ordered new blood work, and referred East back to the orthopedic surgeon for surgical site dehiscence.[9] Doc. 128 at ¶ 67. The infectious disease physician found the PICC line to be dislodged, which East attributes to a CCS nurse pulling out the line and then pushing it back in. Additional testing ordered by the infectious disease physician was added to East's weekly blood draws from the Minnehaha County Jail. Doc. 128 at ¶ 69.

When East returned to the Minnehaha County Jail at 11:25 p.m. on October 10, 2013, he complained of pain in his left arm where the PICC line was replaced and was seen by a nurse. Doc. 128 at ¶ 70. East says he was denied pain medication until 7:45 a.m. on October 11, 2013, however. Doc. 128 at ¶ 70. A nurse practitioner evaluated East around 10:46 a.m. on October 11, 2013, finding the PICC line intact with mild swelling around the site, no induration, no fluctuance, no ecchymosis, and no masses. Doc. 128 at ¶ 71. East submitted another kite at 7:00 p.m. on October 11, 2013, reporting pain in his right foot, right arm, left arm, chest, and heart. Doc. 128 at ¶ 72.

---

[9] Dehiscence is a surgical complication in which a wound ruptures along a surgical incision.

On October 12, 2013, a nurse evaluated East, finding his right foot to be cold to the touch, his pedal pulse to be weak, his foot to be pale in color, and capillary refill to be less than three seconds. The nurse called the on-call provider, who directed that East be sent to the Avera McKennan Hospital emergency room immediately. East recounts that the nurse had to call jail staff three times before a CCS staffer responded, however. Doc. 128 at ¶ 73. At the hospital on October 12, 2013, East underwent a Duplex ultrasound for possible deep vein thrombosis in his right lower extremity that returned no evidence of either deep or superficial deep vein thrombosis. Doc. 128 at ¶ 75. East also underwent an MRI of his thoracic and lumbar spine, which was interpreted as providing no explanation for the right lower extremity weakness but confirming spina bifida consistent with East's preexisting history of that condition. Doc. 128 at ¶ 77. A neurologist also evaluated East and found signs of Raynaud's disease[10] in all four extremities, and ordered Gabapentin[11], an MRI of East's head, and pain service consult. Doc. 128 at ¶ 78. East then underwent a cranial MRI which was read as normal. Doc. 128 at ¶ 79. On October 14, 2013, East was discharged from the hospital with instruction for regular diet and activity as tolerated, prescriptions for Daptomycin and Ceftriaxone by IV daily until November 7, 2013, Gabapentin, Ibuprofen, Tylenol, and Imodium and a daily multivitamin to be taken orally. At the Minnehaha County Jail, East received the medication as ordered. East believes that he was to receive a pain service consult to consider a nerve block and possible continuing consultation for the Raynaud's disease, but recalls no such consultations occurring while he was at the Minnehaha County Jail. Doc. 128 at ¶ 80. On October 15, 2013, a physician under Dr. Heisler's supervision entered orders

---

[10] Raynaud's disease is a rare disorder of the blood vessels, typically in the fingers and toes, that causes narrowing of vessels when a person is cold or stressed.

[11] Gabapentin is a medication with multiple applications, including to control seizures and to relieve nerve pain.

at Minnehaha County Jail for administration of the medications prescribed by the hospital. Doc. 128 at ¶ 81.

East recalls that Nurse Osborne expressed displeasure that East was complaining about her handling of the PICC line to doctors and filing grievances at Minnehaha County Jail. East attributes the removal of the original PICC line and the development of PICC line infections to Nurse Osborne's conduct. Doc. 128 at ¶ 82. East, CCS, and Nurse Osborne disagree over whether Nurse Osborne followed appropriate procedures for East's IV infusions at all times that she administered medications and whether East developed an infection at the site of his PICC line. Doc. 128 at ¶¶ 84–86. East, being the non-movant for summary judgment, has filed an affidavit stating that Nurse Osborne and other CCS staff did not set the IV drip to the correct rate at times, did not administer the medications at 24-hour intervals, did not allow the required five seconds for the hub to dry after cleaning, did not wear gloves when handling the PICC line and medication, gave East expired medication, scolded East when he touched the medicine bag to examine the expiration date, used an unsanitary holding cell for the administration of the medication, and refused to give East a garbage bag to cover his arm while showering, instead instructing him to just hold his arm out of the shower. Doc. 128 at ¶ 84. East recalls a CCS nurse reporting to him that Nurse Osborne had acknowledged to her a minor infection in East's PICC line. Doc. 128 at ¶ 85.

On October 16, 2013, a nurse practitioner examined East at Minnehaha County Jail after a dressing change, observed the wound to be okay, had no concerns, and ordered application of athlete's foot cream between East's right toes during the daily bandage changes. Doc. 128 at ¶ 87. On October 22, 2013, the orthopedic surgeon saw East for a follow-up and observed East to be independent in his activities of daily living, believed no dressing was needed, and suggested a

band-aid to be applied if East desired. Doc. 128 at ¶ 88. On October 24, 2013, East had a post-surgery follow-up with the infectious disease physician, who ordered continued use of the PICC line for dosage of Daptomycin and Ceftriaxone until November 7, 2013. East received those antibiotics through November 7, 2013. Doc. 128 at ¶ 89.

On November 1, 2013, after jail correctional officers observed East throwing up on jail surveillance cameras, East was seen by a nurse who called an on-call physician. Doc. 128 at ¶¶ 90–91. When East's PICC line was changed, however, there were no signs of infection. The next day when the nurse evaluated East, he had rested through the night and had no complaints. Doc. 128 at ¶¶ 93–94. On November 3, 2013, a doctor ordered that East be monitored for reports of any abdominal discomfort, to monitor his PICC line insertion site for increased bleeding, and to call if East needed to go to the emergency room. Doc. 128 at ¶ 95. At 9:50 a.m., within two hours of the physician's order, East was transferred to Avera McKennan Hospital's emergency room for complaints of abdominal pain, loose stools, and PICC line leaking. Doc. 128 at ¶ 96. East underwent a CT scan of his abdomen, which was interpreted as normal, though with colonic fecal residual suggestive of constipation. Doc. 128 at ¶ 97. The laboratory tests done at the hospital were unremarkable. Doc. 128 at ¶ 98.

East returned to the Minnehaha County Jail on November 4, 2013, where a doctor saw East and determined that his PICC site was well bandaged with no sign of bleeding or infection. Doc. 128 at ¶ 99. On November 8, 2013, East received the last antibiotic doses through the PICC line, consistent with the order of the infectious disease physician. Doc. 128 at ¶ 100. East's weekly lab results were normal. Doc. 128 at ¶ 102. East's PICC line then was removed and he was returned to the general population at the Minnehaha County Jail until his sentencing and transfer to Mike Durfee State Prison. Doc. 128 at ¶ 103.

15

## B. Treatment of East at the Mike Durfee State Prison.

East has been housed at Mike Durfee State Prison (MDSP) in Springfield, South Dakota, since on or about April 3, 2014. Doc. 86 at ¶ 10. East notified MDSP that he was experiencing right foot pain on June 30, 2015. Doc. 86 at ¶ 11. East at that time reported that he had been experiencing pain in his foot "at least a week" but the "last two days have been worse." Doc. 86 at ¶ 12. East further said that the pain in his foot started "last week" but escalated when he "started to limp." East said that the "swelling started four hours ago," during a time when he was taking a nap. Doc. 86 at ¶ 13.

Upon examining East's foot, MDSP Health Services noted "swelling on the whole lower top of the foot." East reported pain that traveled up his leg, so arrangements were made to transfer East to the Avera Sacred Heart Emergency Department in Yankton. Doc. 86 at ¶ 15. At the emergency department, x-rays were taken and East was diagnosed with cellulitis in his right foot. Doc. 86 at ¶¶ 16–17.

Upon his return to MDSP, Health Services obtained orders for oral antibiotic treatment and a protocol using Motrin/APAP[12] for discomfort. Doc. 86 at ¶ 17. When East reported to MDSP Health Services for a recheck of his right foot on July 3, 2015, there were no signs of infection and the attending provider noted only "slight swelling in top of foot." East himself reported "decrease in pain" and that he was "able to move all toes." Doc. 86 at ¶ 18.

MDSP Health Services again saw East on July 6, 2015, when East reported that his "pain is controlled at this time." East said that the "swelling has gotten worse since Friday, but better since last Tuesday." Doc. 86 at ¶ 19. When MDSP Health Services rechecked East's foot on July 9, 2015, East was deemed to have "moderate athlete's foot/foot fungus" and was insured to be

---

[12] In this context, APAP refers to acetyl-para-aminophenol, an analgesic drug.

16

taking the antibiotics as directed. Nursing staff was directed to "check area weekly as ordered by provider." Doc. 86 at ¶ 20. On July 13, 2015, East was rechecked and expressed "concern with continued swelling to the anterior right foot." However, upon examination of the foot, the swelling was deemed "very minimal and only to the area just above the toe on the interior right foot." East was "referred to provider to determine need to continue monitoring or need to renew/extend antibiotic treatment." Doc. 86 at ¶ 22.

PA Hanvey saw East on July 14, 2015, for "follow up cellulital emergency department right foot." East reported some mild swelling involving the right foot, but stated that "redness and swelling significantly improved." East at that time denied any "numbness or tingling." Doc. 86 at ¶ 23. Upon examination, PA Hanvey noted "mild soft tissue swelling involving the dorsal aspect of the foot" with "minimal erythema involving the web spaces of the third and fourth digits." PA Hanvey recorded that based on East's history of osteomyelitis in the past, he was prescribing Bactrim twice daily orally, and instructed East to return if there were problems. Doc. 86 at ¶ 24.

On September 16, 2015, MDSP Health Services saw East for "follow up chronic foot pain and cellulitis." The record documented that East had developed cellulitis in the last week of June of 2015 and had completed six weeks of antibiotics as of August 12, 2015. East at that time denied any recurrent redness, but mentioned having some chronic pain involving the dorsum of the foot. Doc. 86 at ¶ 25. PA Hanvey upon examining the foot found a "significant hallux valgus[13] deformity involving the right great toe with bunion formation with tenderness." PA Hanvey ordered x-rays of the right foot "to rule out metatarsal stress fracture" and referred East for a custom orthotic. Doc. 86 at ¶ 26.

---

[13] Hallux valgus, also sometimes called a bunion, is a common forefoot deformity where a painful bony bump develops typically on the inside of the foot at the big toe joint.

The x-ray of East's foot occurred on September 19, 2015, and revealed "healing comminuted fracture of the mid-shaft of the second metatarsal with moderate lateral and dorsal angulation of the fracture fragments." The x-ray also revealed "additional healing fracture" which "involves the distal aspect of the third metatarsal" as well as an old healed fracture of the fourth metatarsal. Doc. 86 at ¶ 27. PA Hanvey reviewed the x-ray results on September 22, 2015, with East, who reported no history of trauma despite the healing or healed fractures. PA Hanvey upon examining East's right foot "noted continued dorsal swelling with tenderness over the first, second and third metatarsals." PA Hanvey placed East in a CAM walker[14] with crutches and referred East to podiatry for definitive treatment and follow-up. Doc. 86 at ¶ 28. Although MDSP Health Services had previously referred East for an orthotic, MDSP Health Services decided to place this referral on hold until the stress fractures had healed. East was recorded to have "voiced understanding of his diagnosis treatment and follow-up." Doc. 86 at ¶ 29.

East saw an outside medical doctor on October 21, 2015, who recorded that East had been "non-weightbearing with crutches for a little while." The physician recommended that East continue to be "non-weightbearing with cast immobilization of his right lower extremity for 2 months." The physician recommended that East use a wheelchair and that after cast immobilization, East then could start ambulating in the hall with a walking boot. Doc. 86 at ¶ 30. The doctor's contemplation seemed to be that East be in a wheelchair for a two-month period. Id.

On October 23, 2015, East was placed in a below-the-knee cast for his right lower extremity. A physician told East to be non-weightbearing on his right foot and to use a wheelchair at all times. Doc. 86 at ¶ 34. The physician record stated "I do recommend wheelchair due to

_____

[14] A CAM walker is a controlled ankle motion boot designed to allow weightbearing on an injured foot without further injury.

spina bifida and weakness in lower extremity," but included that East "needs wheelchair or crutches—whatever is allowed." Doc. 86 at ¶ 35. East told the nurses upon his return to MDSP that he would not use his crutches and would only use a wheelchair. PA Hanvey told East that "he must use crutches for short distance transfers and ambulation," but "that he may use wheelchair for convenience for long distance transfers." Doc. 86 at ¶ 36. East and PA Hanvey clashed over whether East would use crutches at all with East maintaining that his doctor wanted him only in a wheelchair. Id. PA Hanvey told East that if staff observed him ambulating without crutches, Hanvey would recommend placing him in the Special Housing Unit (SHU) to prevent further self-harm. Doc. 86 at ¶ 38.

Part of East's claims about MDSP Defendants being deliberately indifferent to his serious medical needs relate to his conflict with PA Hanvey over use of crutches for short transfers instead of use of a wheelchair only during the time when he had his foot in a cast. East suffered a sprained left ankle while using crutches during this time. Doc. 47 at ¶ 56. When East saw the outside physician on October 23, 2015, East reported that he "stepped on his left foot yesterday and felt something pop and now is having pain in the left foot as well." Doc. 86 at ¶ 48. East had not reported any injury to his left foot on October 22, 2015, to MDSP Health Services and had not submitted a kite or request for sick call concerning any sprained ankle or left foot issue on October 22, 2015. Doc. 86 at ¶ 49. East did not report having a sprained ankle when he was seen at MDSP Health Services on October 23, 2015, and instead the record states that East was "able to demonstrate proper use of crutches after they were adjusted for him." Doc. 86 at ¶ 50. MDSP Health Services recorded East to be "initially very unsteady with the crutches," but "improved after practice down the hallway in medical." East did not complain to MDSP Health Services that he was unable to use the crutches as a result of any sprained left ankle. Doc. 86 at ¶ 51.

On October 24, 2015, East told MDSP Health Services that he had a sprained left ankle, and MDSP Health Services recorded East to say that he sustained the injury on the evening of October 24, when "trying to get out of his wheelchair to utilize his crutches after a phone call with his mother." Doc. 86 at ¶ 52. East denies having told MDSP Health Services any such thing and maintains that he was not allowed to use his wheelchair within the unit during that time, but rather had to park it in an aisle so that it remained visible from the unit pod. East recalls hurting his ankle when, after ending a call with his mother while sitting in a chair, he stood up to use his crutches. Doc. 86 at ¶ 52. East, in fact, reported later to MDSP Health Services that his left ankle was hurt when he "grabbed onto his crutches and put full weight on his left foot to stand up" and then "immediately felt a sharp pain." Doc. 86 at ¶ 53.

Regardless of whether East sprained his left ankle on October 24, 2015, or before, and regardless of the exact manner of the injury, the outside physician examined East's left foot on October 23, 2015, and noted no swelling, no redness, and no ecchymosis. Doc. 86 at ¶ 54. An x-ray taken that day was read as negative. The physician's assessment was that East had an "acute painful sprain midfoot left foot, date of injury October 22, 2015." Doc. 86 at ¶ 54.

On October 24, 2015, when MDSP Health Services saw East, he was wearing a black, medical-issued non-weightbearing boot on his left foot, which had been given to him by the private physician to protect from reinjuring the sprained ankle or foot. Doc. 86 at ¶ 55. By the time East was examined at MDSP Health Services on October 24, 2015, he did not appear to be in acute distress and did not verbalize any pain when the ankle was assessed. Doc. 86 at ¶ 57. MDSP Health Services saw East again on the morning of October 25, 2015, to recheck the pain in the left foot and he appeared to be in no acute distress. East had taken Tylenol and Motrin the night before and reported the left foot pain being improved from how it was the previous day. Doc. 86 at ¶ 58.

On November 25, 2015, East saw a physician who recorded that East had been in a cast for a month and complained of no pain. The x-ray report from that day showed improvement in the stress fracture from four weeks earlier. Doc. 86 at ¶ 39. The physician did not place East back into a cast, but elected to let East "ambulate in the walking boot as long as no pain, redness or swelling develops." Doc. 86 at ¶ 40. MDSP Health Services clarified with the outside physician that it was okay for East to ambulate in the walking boot as long as he had no pain or swelling. MDSP Health Services instructed East to ambulate and use crutches as he needed them. Doc. 86 at ¶ 41. The wheelchair that East had been using was left at medical, East was instructed that he could return to crutches until he felt that he no longer needed them, and East voiced that he might use the crutches for a little while longer. Doc. 86 at ¶ 42.

When East saw the outside physician on November 25, 2015, East asked questions about possible surgery to his right foot, to which the physician responded that the only possible surgery would be for the bunion that would involve "wedge arthrodesis of the first metatarsal cuneiform joint[15]." Doc. 86 at ¶ 59. When East returned to the outside physician on January 4, 2016, East said that he "would like to return around February and if necessary entertain surgery on the bunion." Doc. 86 at ¶ 60. That physician, however, thought that no surgery was necessary for the bunion unless it was painful or caused problems. Id.

East reported pain and other problems caused by the right foot bunion, so the prison arranged for East to see the outside physician on March 8, 2016. Doc. 86 at ¶ 61. East at that time reported his main complaint being "large painful bunion right foot," which caused him to have trouble wearing a shoe. The physician discussed with East the possible surgery for reducing the bunion deformity, which East was hoping to undergo. Doc. 86 at ¶ 62. The physician discussed

---

[15] This is a surgery to correct sever hallux valgus deformity.

the pros and cons of surgical and non-surgical treatments, and East wished to proceed with the surgery. Doc. 86 at ¶ 63. The physician advised East that he would contact PA Hanvey to work through the prison system to see if the bunion surgery would be allowed. Doc. 86 at ¶ 63.

On April 11, 2016, MDSP Health Services saw East for a preoperative physical examination prior to the bunionectomy on his right foot. The records disclose that East "really denies any other problems or complaints today." East was cleared for the surgery. Doc. 86 at ¶ 64.

On April 13, 2016, East underwent surgery for the removal of the bunion, which included the placement of a small stainless-steel locking plate on his first metatarsophalangeal joint held in place by five locking screws. Doc. 86 at ¶ 65. After the surgery, East received a "post op shoe" with instructions to be either on crutches or in a wheelchair. Doc. 86 at ¶ 66. The outside physician who performed the surgery saw East on April 22, 2016, noting that East had been walking on the heel or using a wheelchair and directed East to "continue ambulation only at heel and lateral foot." Doc. 86 at ¶ 67. The physician who performed the surgery saw East again on May 6, 2016, for another postoperative evaluation. East reported that he had no pain. East was directed to continue ambulation only on his heel and lateral foot for the next three weeks. Doc. 86 at ¶ 68.

On May 19, 2016, MDSP Health Services saw East in response to East reporting his right great toe to be red, swollen, and draining. According to East, he was "wiggling his toe and felt a pop last night." Doc. 86 at ¶ 69. MDSP Health Services made arrangements to send East to the emergency department of Avera Sacred Heart Hospital that day. East told a physician at Avera Sacred Heart Hospital that he "bent his toes in bed, he felt something crack in the great toe where he had his surgery." Doc. 86 at ¶ 70. The attending physician at the emergency room diagnosed East with an ingrown toenail of his right great toe, with secondary cellulitis. Doc. 86 at ¶ 71.

MDSP Health Services saw East on May 30, 2017, because East had concerns about his toenail not growing and causing inflammation and drainage in the area where he had the surgery. East asked whether his toenail needed to be removed. Doc. 86 at ¶ 72. East also worried about his great toe starting to curve again. MDSP Health Services felt that due to his past history of surgeries and ongoing issues with his feet that a provider appointment ought to be scheduled to evaluate the issues. Doc. 86 at ¶ 73.

PA Adams, on June 5, 2017, saw East. East described having slight pain with a lump over the medial aspect near the incision and was wondering if he had an issue with the hardware from the surgery. Doc. 86 at ¶ 74. PA Adams examined the right great toe, found a "slight prominent lump over the medial aspect of the incision that is slightly tender to palpation," and noted that the great toe was "starting to deviate over the second toe." PA Adams ordered an x-ray of the right foot, with plans to have East's foot surgeon review it. Doc. 86 at ¶ 75.[16]

On June 6, 2017, East learned that the x-rays of his foot were negative. East recalls being told that he needed to exercise more, so he tried to jog despite the pain in his foot. East submitted a kite dated June 13, 2017, stating that he had injured his foot while jogging. East did not receive a referral to the outside podiatrist until June 21, 2017, and did not actually see that outside podiatrist until June 28, 2017. Doc. 86 at ¶ 76.

MDSP Health Services did see East on June 14, 2017, at which time East reported that he was "jogging one lap on track at rec" when his "foot, ankle and knee started hurting." Doc. 86 at ¶ 78. MDSP Health Services issued East crutches and an ACE wrap to be used for seven days,

---

[16] The information concerning East's June 5, 2017 visit to PA Adams is not disputed by East, but is more than what is contained in the allegations against PA Adams in East's most recent complaint. PA Adams has made a motion to dismiss, so this Court must look to the well-pleaded allegations of the most recent complaint initially in deciding if an action is stated against PA Adams.

and later scheduled an appointment with the podiatrist for evaluation of worsening pain in the right foot. Doc. 86 at ¶ 79.

When the podiatrist saw East on June 28, 2017, East recounted his effort to get more exercise and hurting the foot while jogging. X-rays of the foot showed the hardware to be intact "for the most part." There was a "fractured screw holding the plate to the bone." Doc. 86 at ¶ 80. The podiatrist discussed surgical and non-surgical options with East at that time. Doc. 86 at ¶ 81. The podiatrist planned to discuss with the primary care providers at the prison the possibility of getting permission for a revision of the right foot surgery. In the interim, East was told that he "may walk to tolerance, increase exercise levels, and use wheelchair for long distances." Doc. 86 at ¶ 82. The podiatrist ran through options with East, including removal of the hardware, arthroplasty or arthroplasty implant, or even amputation of the right hallux." The podiatrist and East agreed upon a procedure to remove the hardware and ultimately arthrodesis (the surgical immobilization of a joint by fusion of the adjacent bones) with bone graft. Doc. 86 at ¶ 83.

The prison cleared East for surgery and East saw MDSP Health Services for a pre-surgical evaluation on July 14, 2017. East underwent surgery on July 19, 2017. Doc. 86 at ¶ 84. East's claim for deliberate indifference to serious medical need against Unit Coordinator Foley concerns in part East not getting his own wheelchair after the July 19, 2017 surgery. Doc. 47 at ¶ 62. East instead had to use the unit's wheelchair until August 2, 2017, after which he was assigned his own wheelchair. Doc. 47 at ¶ 62; Doc. 86 at ¶ 85. During this time, however, East twice was denied the use of the unit wheelchair when it was needed by other inmates. Doc. 86 at ¶ 85.

The podiatrist, in his July 19, 2017 report, stated that East "can use right foot to transfer." Doc. 86 at ¶ 87. MDSP Health Services instructed East to use crutches for partial weightbearing on his foot and for transfer with wheelchair for long distances. Doc. 86 at ¶ 87. On July 30, 2017,

East submitted an "informal resolution request" asking for wheelchair assignment, although he did not complain to MDSP Health Services about denial of the use of a wheelchair between July 19 and August 2, 2017. Doc. 86 at ¶ 88. The podiatrist saw East on July 27, 2017, for a one-week follow-up after the right foot surgery, and East did not mention denial of wheelchair use to him during that visit. Doc. 86 at ¶ 89. East, however, reiterated his request for his own wheelchair when seen by MDSP Health Services on August 2, 2017. Doc. 86 at ¶ 92. East did not suffer any further injury to his foot and by the time of his August 9, 2017 visit with the podiatrist was reporting no pain in his right foot nor trouble moving the toes of his right foot. Doc. 86 at ¶ 93. East's right foot had no signs of infection, the incision site was healing, and the sub-capillary refill time was immediate for all digits of the right foot. Doc. 86 at ¶ 94.

East also claims that Unit Coordinator Foley refused East's request to be housed in an air-conditioned area post-surgery consistent with the podiatrist's direction. Doc. 47 at ¶ 66. Indeed, the podiatrist on July 29, 2017, had recommended that East "be in air conditioning for one week" following the 2017 surgery. Doc. 86 at ¶ 95. East was in the air-conditioned prison infirmary for a 24-hour observation period after the surgery on his right foot, and at the time of the discharge from infirmary had no acute distress or complaints of pain. Doc. 86 at ¶ 96. East went back to his non-air-conditioned unit for the night of July 20, 2017, where it was very hot. East's father learned of the situation and complained, and the prison transferred East back to acute infirmary sheltered housing, which was air conditioned, on July 21, 2017. Doc. 86 at ¶¶ 96−97. East maintains that he did not have access to clean water in the infirmary shelter unit and did not receive pain medication as prescribed there. Doc. 86 at ¶ 98. When the temperatures fell into the 80s, East requested discharge back to his unit, but the prison chose to house him an air conditioned unit through July 27, 2017, consistent with the podiatrist's recommendation. Doc. 86 at ¶¶ 99−100.

Housing East in an air-conditioned unit lessened the chance of infection because of extreme heat; the records after the July 19, 2017 surgery establish that East did not develop an infection as a result of being out of an air-conditioned environment for parts of July 20 and 21, 2017. Doc. 86 at ¶¶ 102−05.

East's § 1983 claims include that MDSP provided him a walking boot after surgery that was too big for his foot. Doc. 47 at ¶ 70. On October 10, 2017, the podiatrist saw East who was ten weeks post operation, noted that East was having no pain, and prescribed a protective boot to wear on his right foot. Doc. 86 at ¶ 106. East was to wear the walking boot to start ambulating and then to return in three weeks for a recheck and x-rays of the right foot. Doc. 86 at ¶ 108. PA Adams and nursing staff at MDSP Health Services had provided a right foot boot previously on August 28, 2017, to East. Between August 28 and October 10, 2017, MDSP Health Services regularly had seen East and East had not complained about the boot issued on August 28, 2017. Doc. 86 at ¶ 110. On October 10, 2017, the podiatrist recommended that East be provided a smaller boot. Doc. 86 at ¶ 111. MDSP did not have a smaller boot in stock and learned that the other prison facility (the South Dakota State Penitentiary in Sioux Falls) only had large walking boots as well. Doc. 86 at ¶ 112. The prison sought a boot from another facility in Yankton, but that facility did not have smaller boots either. Doc. 86 at ¶ 113. Nursing staff discussed ordering a smaller boot, but chose not to do so because East needed the boot for only three weeks and it could take longer for a smaller boot to arrive. Doc. 86 at ¶ 114. PA Adams, upon learning this, was okay with the plan to leave East in the current boot, as long as East's foot was not sliding about in the boot. Doc. 86 at ¶ 115. Nursing staff then examined East's foot in the boot and deemed it "snug around heel, foot and leg," but simply "long in nature." Doc. 86 at ¶ 116.

On October 17, 2017, East reported to MDSP Health Services with a chief complaint of right ankle and foot pain, with swelling to the right ankle. East said that the pain had been present since that morning. East recalls telling MDSP Health Services that he felt he had injured his ankle while wearing the boot, although MDSP Health Services records did not record that statement. Doc. 86 at ¶ 118. Nursing staff provided East education on sprains and directed East to use the wheelchair until he was seen by a provider. Doc. 86 at ¶ 119.

On October 18, 2017, PA Adams saw East for his right ankle pain.[17] East told PA Adams that he started noticing some discomfort and swelling in his right ankle after he had recently started to ambulate in the walking boot. Doc. 86 at ¶ 120. East described the walking boot as "quite bulky and cumbersome." PA Adams suspected that the swelling and discomfort could be due to overuse, given that East had spent extended time on non-weightbearing status. Doc. 86 at ¶ 123. PA Adams noted some generalized swelling in the ankle, although East's ankle had fairly good range of motion. Doc. 86 at ¶ 124. PA Adams decided to obtain x-rays of East's right foot and ankle, which then were taken on October 19, 2017, and which revealed a "new complex fracture of right calcaneus[18]." Doc. 86 at ¶ 125.

MDSP officials transported East to the emergency room of Avera Sacred Heart Hospital on October 24, 2017, where he "denied any recent trauma or new fall." Doc. 86 at ¶ 122. At that time, East had worsening right ankle pain and swelling of his right foot. Doc. 86 at ¶ 126.

On October 25, 2017, the podiatrist saw East for what was described as "a new problem consisting of body fracture of the calcaneus right foot." Doc. 86 at ¶ 127. The podiatrist's report noted that the new injury occurred after East "began weightbearing after three months of non-

---

[17] As explained in an earlier footnote, this Court must consider East's allegations in his most recent amended complaint, rather than these undisputed facts, in ruling on PA Adams's motion to dismiss.
[18] The calcaneus is the largest tarsal bone in the foot and is commonly known as the heel bone.

weightbearing." Doc. 86 at ¶ 127. The podiatrist discussed treatment options with East and advised that conservative care would consist of casting for a couple of months with non-weightbearing. Doc. 86 at ¶ 128. The podiatrist then placed another cast on East's right foot on October 25, 2017. Doc. 86 at ¶ 129.

A couple of months later on December 28, 2017, the podiatrist removed the cast, took x-rays of East's right foot, found good healing of the fracture, and noted that East complained of no pain. Doc. 86 at ¶ 130. The podiatrist ordered that East start weightbearing "in a short medium-sized walking boot starting today." Doc. 86 at ¶ 131. East on that day had with him a tall black boot and a short gray boot. Id. The podiatrist believed both boots, which were size large, were too big for East and thought that a medium boot would be much better. Doc. 86 at ¶ 132. The podiatrist then had a phone conversation with "Stephanie" from the medical floor at the penitentiary who had a brand-new short gray medium-sized walking cast boot and agreed to make that boot available to East. Doc. 86 at ¶ 133.

When East saw the podiatrist on February 16, 2018, for a recheck of the fractured right heel, East was not experiencing pain and his foot and ankle felt good. The podiatrist suggested that East's right foot be placed in a regular shoe. Doc. 86 at ¶ 134. X-rays taken at the time revealed good consolidation of the calcaneal fracture such that the foot was deemed to be healed. Doc. 86 at ¶ 135. As of that point, East no longer needed a wheelchair for long distances and could use a shoe with an insert. Doc. 86 at ¶ 136.

In East's most recent amended complaint, he alleges that Warden Dooley and the prison maintained a de facto custom or practice or an actual policy of ignoring and condoning providing inadequate health and medical assistance to address East's serious medical needs. Doc. 47 at ¶ 94. South Dakota Department of Corrections Policy 1.4.E.1 specifically provides that: "The

Department of Corrections (DOC) will provide all offenders with access to healthcare services" and that "no offender will be denied medically necessary healthcare due to a lack of available funds in their institutional account." Doc. 86 at ¶ 139. The policy further provides that: "Offenders will have daily access to healthcare provided by qualified healthcare professionals," and that "Treatment of an inmate's condition is not limited by the resources and services available at the facility." Doc. 86 at ¶ 140. Finally, the policy provides that: "The Department of Health (DOH) will maintain agreements with approved local hospitals, providers and private emergency service contractors to provide health services to inmates," and that inmates "will be transported safely, securely and in a timely manner to all authorized medical . . . appointments outside the facility." Doc. 86 at ¶ 141. East was seen on a continuing basis by MDSP Health Services and frequently by the podiatrist in response to his complaints of foot pain. Doc. 86 at ¶ 143.

In Count 5 of his most recent amended complaint, East contends that John Does 1 and 2 (Baker and Goins) violated his Eighth Amendment right "by utilizing unnecessary force." Doc. 47 at ¶ 97. According to East, Baker "placed a belly chain on [East] tightly" and "asked if it were too tight." Doc. 47 at ¶ 76; Doc. 90 at ¶ 33. When East responded that he could barely breathe, Baker commented that the chain should be tighter. Doc. 47 at ¶ 76; Doc. 90 at ¶ 33. East thereafter was quiet. Doc. 86 at ¶ 147.[19] Department of Corrections policy for inmate transports and escort requires that an inmate transported outside the security perimeter "will wear handcuffs and a belly chain unless otherwise exempted by the Senior Security Officer." Doc. 86 at ¶ 149. The policy also provides that any emergency or unscheduled transports of an inmate from a secure facility to a medical facility for outpatient care require two armed staff members. Doc. 86 at ¶ 149. The use

---

[19] Baker and Goins contest that the belly chain was too tight or that East claimed that he could barely breathe. However, East is entitled to have the facts viewed in the light most favorable to him, as the non-moving party in resolving motions for summary judgment.

of restraints and two guards for travel of an inmate outside of the security perimeter is intended to ensure safety of the public and to prevent escapes and attempted escapes. Doc. 86 at ¶ 150. During the hospital visit where East contends the belly chain was so tight that he could barely breathe, East made no complaint to anyone in the emergency room of the Avera Sacred Heart Hospital regarding shortness of breath or discomfort associated with the belly chain, nor did East file any grievance alleging the use of excessive force or threats by the guards. Doc. 86 at ¶¶ 155−56. After his return to the prison on October 24, 2017 (the visit where he claims the belly chains were too tight), East did not make a complaint to MDSP Health Services or file a kite regarding the tight belly chain. Doc. 86 at ¶ 157. East explains that he was too scared to make such a report. Doc. 86 at ¶¶ 157−58. There is nothing in the medical records that suggests that East suffered any injury from use of the belly chain. Doc. 86 at ¶¶ 157−58.

East also contends that Baker and Goins violated his Eighth Amendment rights by "taunting plaintiff." Doc. 47 at ¶ 97. East says that Baker brandished his firearm at East and warned East not to try anything "because I'll go John Wayne on your ass." Doc. 47 at ¶ 76; Doc. 90 at ¶ 34. Baker, according to East, also showed him the clip of ammunition, pointed the gun toward East, and said "I will shoot you, East." Doc. 47 at ¶ 76; Doc. 90 at ¶ 34.[20] East never filed a grievance concerning this claimed behavior. Doc. 86 at ¶ 162. East explains that he was too afraid of possible retaliation from gun toting guards to file a grievance, but he has now filed a complaint in federal court against those guards, albeit naming them as John Does 1 and 2. Doc. 86 at ¶ 162.

## III.    Discussion

---

[20] Baker and Goins deny in affidavits that anything akin to this occurred, but East is entitled to have disputes of fact resolved in his favor in ruling on motions for summary judgment.

## A. Qualified Immunity and Deliberate Indifference Standard

Under § 1983, state officials may be sued in their individual capacities, their official capacities, or both. Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999). Individual and official capacity suits differ in both their pleading requirements and the defenses available to the official. See Hafer v. Melo, 502 U.S. 21, 25 (1991). East in his briefing makes clear that he is suing state officials only in their individual capacities. Doc. 87 at 2.

The doctrine of qualified immunity is a defense available to state officials sued in their individual capacities under § 1983. The MDSP Defendants contend that East's individual capacity claims against them are barred under this doctrine. "On summary judgment, a defendant official is entitled to qualified immunity unless '(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation.'" Walton v. Dawson, 752 F.3d 1109, 1116 (8th Cir. 2014) (quoting Howard v. Kan. City Police Dep't, 570 F.3d 984, 988 (8th Cir. 2009)). If a § 1983 plaintiff fails to establish either prong—and the court may consider one without the other—qualified immunity shields the officials from suit. See Pearson v. Callahan, 555 U.S. 223, 236 (2009). But a district court "may not deny qualified immunity without answering both questions in the plaintiff's favor." Walton, 752 F.3d at 1116; see also Pearson, 555 U.S. at 236.

Independent contractors providing services at state prisons do not typically have qualified immunity defenses. See Richardson v. McKnight, 521 U.S. 399, 401 (1997) (holding that private company prison guards were not entitled to qualified immunity defense in a § 1983 case); see also Hunter v. S.D. Dep't of Soc. Servs., 3:17-CV-03016-RAL, 2019 WL 1333638, at *11 (D.S.D. Mar. 25, 2019). Defendants CCS, Dr. Heisler, PA Adams and Nurse Osborne were independent contractors, not state employees, and thus do not have qualified immunity defenses here.

Unquestionably, however, in providing medical care to a state inmate like East, those independent contractors were "willing participants in a joint action with public servants acting under color of state law" and thus may be sued under § 1983. Johnson, 172 F.3d at 536; see Dennis v. Sparks, 449 U.S. 24, 27 (1980); see also Blessing v. Freestone, 520 U.S. 329, 340 (1997) ("Section 1983 imposes liability on anyone who, under color of state law, deprives a person 'of any rights, privileges, or immunities secured by the Constitution and laws.'" (citation omitted)).

East's principal claim against all defendants—other than Baker and Goins—involves what, generally speaking, is a clearly established right under the Eighth Amendment. "The Eighth Amendment prohibition on cruel and unusual punishment protects prisoners from deliberate indifference to serious medical needs." Laganiere v. Cty. of Olmsted, 772 F.3d 1114, 1116–17 (8th Cir. 2014). A plaintiff who claims that a defendant was deliberately indifferent to his medical needs must show that he suffered "an objectively serious medical need, and that the 'defendant actually knew of, but deliberately disregarded, such need.'" Id. (quoting McRaven v. Sanders, 577 F.3d 974, 980 (8th Cir. 2009)); see also Farmer v. Brennan, 511 U.S. 825, 837 (1994) (holding "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference"). "An objectively serious medical need is one that either has been diagnosed by a physician as requiring treatment, or is so obvious that even a 'layperson would easily recognize the necessity for a doctor's attention.'" Jones v. Minn. Dep't of Corr., 512 F.3d 478, 481 (8th Cir. 2008) (quoting Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997)). '[A]ctual knowledge of a serious medical need may be inferred from circumstantial evidence or from the very fact that the risk was obvious." Id. at 481–82 (citing Farmer, 511 U.S. at 842). "It is sufficient to show that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about

it." Letterman v. Does, 789 F.3d 856, 862 (8th Cir. 2015) (cleaned up) (quoting Farmer, 511 U.S. at 842). If knowledge is shown, the plaintiff must then show the defendants "'knew that their conduct was inappropriate in light of' the risk to the prisoner." Id. (quoting Krout v. Goemmer, 583 F.3d 557, 567 (8th Cir. 2009)).

"Deliberate indifference may include intentionally denying or delaying access to medical care, or intentionally interfering with treatment or medication that has been prescribed." Pietrafeso v. Lawrence Cty., 452 F.3d 978, 983 (8th Cir. 2006) (quoting Vaughan v. Lacey, 49 F.3d 1344, 1346 (8th Cir. 1995)). However, deliberate indifference demands that a plaintiff show more than negligence and gross negligence, "and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." Langford v. Norris, 614 F.3d 445, 460 (8th Cir. 2010) (quoting Alberson v. Norris, 458 F.3d 762, 765 (8th Cir. 2006)). Rather, a plaintiff must show that the defendant's mental state was "akin to criminal recklessness." McCaster v. Clausen, 684 F.3d 740, 746 (8th Cir. 2012) (quotation omitted). When evaluating whether a defendant deliberately disregarded a risk, the court considers the "actions in light of the information [the defendant] possessed at the time, the practical limitations of [the defendant's] position and alternative courses of action that would have been apparent to an official in that position." Letterman, 789 F.3d at 862 (quoting Gregoire v. Class, 236 F.3d 413, 419 (8th Cir. 2000)). With these standards in mind, this Court addresses East's claims for deliberate indifference to his serious medical needs with respect to his care first at the Minnehaha County Jail and second at MDSP.

## B. Minnehaha County Jail Care

### 1. Service of Process on Nurse Osborne

East named Nurse Osborne as a Defendant in his most recent complaint. Doc. 47. Nurse Osborne filed a declaration in this case, Doc. 119, detailing her background, employment as a registered nurse with CCS, and summarizing her personal knowledge of the treatment she provided to East at Minnehaha County Jail. The declaration is silent on whether she ever was served as a Defendant in this case. Doc. 119. CCS's Statement of Undisputed Material Facts at ¶ 12 states: "Linda Osborne has not been served with a summons and copy of any complaint in this case." Doc. 118. East responded to ¶ 12 with "no dispute." Doc. 128. East's Memorandum in Opposition to CCS's Motion for Summary Judgment makes no argument that Nurse Osborne ought to remain a Defendant in the case. Doc. 127.

Rule 4(m) of the Federal Rules of Civil Procedure provides:

> If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time.

Fed. R. Civ. P. 4(m). Dismissal without prejudice of any claim against Nurse Osborne is appropriate here.

### 2. Statute of Limitations Issue

Both CCS and Dr. Heisler argue that they were sued outside of the applicable statute of limitations, contending that East's claim against them accrued in August of 2013. East's original pro se complaint, dated August 18, 2016, and filed August 29, 2016, named as Defendants "Minnehaha County, South Dakota and other unknown persons, individually and in their capacity as employees of Minnehaha County, South Dakota." Doc. 1. That original complaint alleged deliberate indifference relating to East's foot condition at the Minnehaha County Jail that resulted in the onset of osteomyelitis and removal of his fifth phalanx through surgery on September 24, 2013. Doc. 1. East alleged that "unknown defendants were acting under color of state law" at that

time. Doc. 1 at ¶ 8. East's first effort at an amended complaint in October of 2016 continued to name "other unknown persons." Doc. 10. After this Court granted East leave to file an amended complaint, East in April of 2017, named "Ms. _____-Heisler" among various Defendants. Doc. 21. East's next effort to amend his complaint also named Dr. Heisler, Doc. 25-1, as did his subsequent effort to amend his complaint, Doc. 34-1. The first time that CCS was named as a Defendant came in the most recent amended complaint, after this Court appointed counsel to East. Doc. 47.

Section 1983 does not contain a specific statute of limitations, so federal courts apply the most analogous state statute of limitations. Bell v. Fowler, 99 F.3d 262, 265–66 (8th Cir. 1996). The most analogous state statute of limitations under South Dakota law is SDCL § 15-2-15.2, which provides:

> Any action brought under the federal civil rights statutes may be commenced only within three years after the alleged constitutional deprivation has occurred. This section is prospective in application.

SDCL § 15-2-15.2. Although the limitations period is governed by state law, the date of commencement of a § 1983 action is a matter of federal procedural law. Gross v. Weber, 112 F. Supp. 2d 923, 925 (D.S.D. 2000). Under Rule 3 of the Federal Rules of Civil Procedure, a lawsuit is commenced when the complaint is filed.

Both CCS and Dr. Heisler contend that any complaint naming them was filed well outside the three-year period from when they could have committed any alleged constitutional deprivation against East; after all, East was diagnosed with osteomyelitis as a result of an x-ray on August 16, 2013, underwent the toe amputation on September 24, 2013, and was gone from Minnehaha County Jail custody by April 3, 2014. East responds that his cause of action accrued no earlier

than September 4, 2013, when he learned that the osteomyelitis diagnosis meant that he would need to have his toe amputated. Doc. 114 at ¶ 3.

Under federal law, a cause of action accrues "when the plaintiff has a complete and present cause of action," which occurs when "the plaintiff can file suit and obtain relief." Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal., 522 U.S. 192, 201 (1997) (citation omitted). Put another way, "a plaintiff's cause of action accrues when he discovers, or with due diligence should have discovered, the injury that is the basis of the litigation." Union Pac. R.R. Co. v. Beckham, 138 F.3d 325, 330 (8th Cir. 1998); see also Johnson v. Precythe, 901 F.3d 973, 980–81 (8th Cir. 2018), petition for cert. docketed, No. 18-852 (U.S. Jan. 4, 2019). East argues that he remained unaware of the seriousness of his medical condition as late as August 31, 2013, which is when he made a health service request not to go to Avera McKennan Hospital for further checkup on his foot. The date of accrual matters dearly with respect to East's claims against CCS and Dr. Heisler, because East contends that his amended complaints naming those two Defendants relate back to his original filing on August 29, 2016.

Rule 15(c)(1)(B) indeed permits a plaintiff to file an amended complaint that relates back to his original complaint, if the claim arose out of the same transaction or occurrence. Fed. R. Civ. P. 15(c)(1)(B). "Relation back" depends on the existence of a "common core of operative facts" uniting the original complaint to the newly asserted claims. Mayle v. Felix, 545 U.S. 644, 664 (2005). The "core of operative facts" alleged in East's original complaint concerned alleged deliberate indifference to his foot injury resulting in osteomyelitis and amputation of his toe. Doc. 1. The "other unknown persons" referenced in East's original complaint could cover Dr. Heisler and at least employees of CCS, if not CCS itself.

Rule 15(c)(1)(C) permits the relation back of an amendment that "changes the party or the naming of the party against whom a claim is asserted" if the provisions of Rule 15(c)(1)(B) are met and, within the time period set by Rule 4(m) for service of process, the party named in the amended complaint received "such notice of the action that it will not be prejudiced in defending on the merits . . . and knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1)(C); see also Goodman v. Praxair, Inc., 494 F.3d 458, 469 (4th Cir. 2007) (concluding that Rule 15(c)(1)(C) covers the addition of parties rather than just the substitution of parties); 6A Charles Alan Wright et al., Federal Practice and Procedure § 1498.2 (3d ed.) (explaining that if the requirements of Rule 15(c) are met, "there is no justification for a restrictive interpretation of the word 'changing' that would require a plaintiff to choose among defendants"). There appears to be no particular prejudice to Dr. Heisler or CCS in defending the case, and although entirely inartful, the original complaint reflects an effort by East to sue and name those responsible for his medical care at the Minnehaha County Jail. See Doc. 1.

There appears to be an issue of fact over exactly when East learned of the alleged improper treatment such that his claim accrued. East contends that September 4, 2013, is the triggering date, but his most recent complaint alleged that sometime in August of 2013, a doctor at the hospital informed him that "he should have been seen at the hospital for treatment of his foot as early as June 2013." Doc. 47 at ¶ 28. CCS contends that this August 2013 hospital visit occurred either on August 20 or August 22, 2013. Doc. 120 at ¶ 18.

There is the added question about the applicability of the "prison mailbox rule," under which prisoners filing pro se civil rights complaints under § 1983 have their complaints deemed to be filed on the day they deposit the complaint in the prison internal mail system for forwarding

to the district court. <u>Sulik v. Taney Cty.</u>, 316 F.3d 813, 815 (8th Cir. 2003), <u>rev'd in part on other grounds</u>, 393 F.3d 765 (8th Cir. 2005); <u>Mortensbak v. Butler</u>, 102 F. Supp. 3d 1085, 1090 n.6 (D.S.D. 2015). East's original complaint, although filed August 29, 2016, was dated August 18, 2016. Doc. 1. The envelope in which the clerk of court received the complaint has a postage stamp and was sent from MDSP in Springfield, South Dakota, but does not contain a postmark with the date of mailing. Doc. 1−1. East's affidavit submitted in this matter confirms that he signed the complaint on August 18, 2016, but does not state when he placed it in the prison mail. Doc. 112 at ¶ 3; Doc. 126 at ¶ 3. Ultimately, given the factual issues surrounding when East's claim accrued and when he deposited his complaint in the prison mail,[21] this Court withholds ruling at this time on CCS and Dr. Heisler's argument for summary judgment based on the running of the statute of limitations.

### 3. Respondeat Superior Issue

East has named two non-person entities as Defendants in his most recent complaint, in suing Minnehaha County and CCS. Minnehaha County has answered, Doc. 62, but has not filed a motion for summary judgment or to dismiss.

Section 1983 extends federal jurisdiction for civil actions for deprivation of rights against a "person." 42 U.S.C. § 1983. Neither Minnehaha County nor CCS are a "person." A corporation acting under color of state law can be held liable under § 1983 for unconstitutional policies, but not on a theory of respondeat superior. <u>Smith v. Insley's Inc.</u>, 499 F.3d 875, 880 (8th Cir. 2007). That is, a private corporation like CCS may be liable under § 1983 only if the injury alleged is a result of the corporation's policy or practice or if the corporation knew of its employees'

---

[21] There also is a thorny legal issue here of how the period set for service under Rule 4(m) and referenced in Rule 15(c)(1)(C) may apply to a pro se inmate's § 1983 complaint where a district court must screen and authorize service of process. No party analyzed that issue in briefing.

misconduct and failed to take steps to end the misconduct.  Id.  East names Minnehaha County and CCS for purposes of Count 2 of his most recent complaint where he alleges a violation of his civil rights through deliberate indifference to his serious medical needs as a result of "customs, practices, and policies" of Minnehaha County and CCS.  Doc. 47 at ¶¶ 84−86.  East contends that he needs an opportunity to conduct discovery on such a claim.  However, if East was not subject to deliberate indifference to his serious medical needs while at Minnehaha County Jail, Count 2 of his complaint for such deliberate indifference being attributable to customs, practices, and policies would fail.  See Crumpley-Patterson v. Trinity Lutheran Hosp., 388 F.3d 588, 590–91 (8th Cir. 2004) (explaining that plaintiffs seeking to hold a corporation liable under § 1983 must show that they were "injured by acts pursuant to [the] custom, i.e., that the custom was the moving force behind the constitutional violation" (citation omitted)); Webb v. City of Maplewood, 889 F.3d 483, 487 (8th Cir. 2018) (explaining that there must be an unconstitutional act by a municipal employee before a municipal liability can be held liable, although there "need not be a finding that a municipal employee is liable in his or her individual capacity" (citation omitted)).

Thus, this Court turns to whether, viewing the facts in the light most favorable to East, he has a viable claim for deliberate indifference to his serious medical needs while at the Minnehaha County Jail.

### 4.  Merits of Eighth Amendment Claim Involving Care at Minnehaha County Jail

East's foot issues while at the Minnehaha County Jail started in early April of 2013, with his reporting a problem with his right on April 6, 2013.  A nurse visited East the same day he made the report and East saw Dr. Heisler the next Monday, two days after his report.  Dr. Heisler directed CCS staff at Minnehaha County Jail to dress and clean the wound daily, and East began receiving an oral antibiotic.  East received near daily wound care thereafter.

In May of 2013, East's foot issues appeared to be worsening, and a different antibiotic was prescribed. Dr. Heisler or a medical resident working under her saw East on a number of occasions in 2013. Dr. Heisler by late May suspected and in June of 2013 thought that East had cellulitis, a bacterial infection of the skin and subcutaneous tissues in his toe. CCS staff was ordered to and continued near daily wound care, including unwrapping, observing, cleaning, treating with a triple antibiotic ointment, or other substance and recovering the infected area.

When Dr. Heisler saw East on June 12, 2013, she thought there was a deeper infection than what she had previously observed and ordered a change in daily wound care to include irrigation with peroxide and different shoes to assist with wound healing. Although the daily records suggest that East's foot infection was worsening, Dr. Heisler on July 9, 2013, thought the foot infection to be improving and ordered a change in the type of gauze with directions that the dressing be removed at night to let it air out. On July 23, 2013, Dr. Heisler in rechecking the wound thought that there was an ulcer preventing healing and ordered more treatment and daily cleaning.

East had an acute onset of edema and decreased sensation in his foot on August 7, 2013. The antibiotic was changed to Bactrim, and East saw a medical resident working under Dr. Heisler on August 12, 2013. It was not until August 15, 2013, that Dr. Heisler upon seeing East, ordered an x-ray of East's foot, which the next day was read as showing possible osteomyelitis, an infection of the bone far more serious than mere cellulitis. East's claim against Dr. Heisler primarily relates to the delay in ordering the x-ray or referring him to an outside physician for evaluation of possible osteomyelitis.

Perhaps Dr. Heisler made an error in judgment or even malpractice in not discerning possible osteomyelitis earlier during East's care. In hindsight, Dr. Heisler should have ordered an x-ray earlier, referred East to a specialist earlier, and been suspicious of osteomyelitis earlier.

However, the deliberate indifference standard requires more than a showing of negligence or even gross negligence. Langford, 614 F.3d at 460; Alberson, 458 F.3d at 765. Rather, Dr. Heisler's mental state must be "akin to criminal recklessness." McCaster, 684 F.3d at 746 (citation omitted). This Court must consider Dr. Heisler's actions in light of the information that she possessed at the time, the practical limitations of her position, and alternative courses that would have been apparent to her. Letterman, 789 F.3d at 862; Gregoire, 236 F.3d at 419. Even viewing the facts in the light most favorable to East, Dr. Heisler's conduct was not "akin to criminal recklessness," but at worst was negligence or gross negligence. See Langford, 614 F.3d at 460.

Similarly, East's claims regarding deficient care at Minnehaha County Jail after the toe amputation fall short of deliberate indifference to serious medical needs, even when viewed in the light most favorable to East. After the surgery, East received ongoing medical attention at Minnehaha County Jail. He received intravenous antibiotics through a PICC line and was referred to Avera McKennan Hospital when there were concerns about worsening of his condition. East did have problems with his PICC line, with ultimate removal of it and replacement at a different site, but underwent the full course of antibiotics as ordered by outside physicians, with the PICC line ultimately being removed on November 8, 2013. This Court has examined and considered the course of treatment of East at Minnehaha County Jail at length and concludes that, even viewing the facts in the light most favorable to East, his care at the Minnehaha County Jail for any serious medical issue did not meet the "deliberately indifferent" standard. Thus, Dr. Heisler and CCS are entitled to summary judgment.

### C. MDSP Care

#### 1. Merits of Eighth Amendment Claim Against MDSP

East began serving his sentence at MDSP on or about April 3, 2014. His first report of right foot pain appears to have been on June 30, 2015. When MDSP Health Services examined East's foot, his foot had swelling in the entire lower top and East reported pain traveling up his leg. MDSP Health Services made arrangements to transfer East to the Avera Sacred Heart Emergency Department where he was diagnosed with cellulitis in his right foot. He then received an antibiotic for the infection and an analgesic for his discomfort, and the pain was substantially reduced and the swelling significantly improved by mid-July of 2015. East completed the course of antibiotics as of August 12, 2015. East has no claim for deliberate indifference to serious medical condition arising out of events in the summer of 2015 at MDSP.

On September 16, 2015, a physician assistant at MDSP examined East's right foot and found a bunion on his big toe with tenderness. The PA ordered x-rays, which occurred on September 19, 2015, and revealed several healing or healed fractures of East's foot. The PA then put East in a walker, with crutches, and referred him to podiatry. The podiatrist in turn recommended that East be placed in a cast and use a wheelchair.

On October 23, 2015, East was placed in a below-the-knee cast for his right lower extremity. The physician's record recommended a wheelchair, but included reference that East "needs wheelchair or crutches—whatever is allowed." East clashed with MDSP Health Services over whether East would use crutches at all; East wanted to be only in a wheelchair, while MDSP wanted him to use a wheelchair for long-distance transfers, but crutches for short-distance transfers. Under the deliberate indifference to serious medical needs standard, "mere disagreement with treatment decisions does not rise to the level of a constitutional violation." Langford, 614 F.3d at 640 (quoting Alberson, 458 F.3d at 765). As a matter of law, this disagreement over the extent to which East could rely on a wheelchair is not deliberate indifference to East's serious

medical needs. The mere fact that East sprained his left ankle in late October of 2015 while getting out of a chair to use his crutches does not thereby establish that MDSP Health Services was deliberately indifferent to his serious medical needs.

On November 25, 2015, East saw the podiatrist who noted from x-rays that East's foot had been healing and allowed East to ambulate in a walking boot as long as he did not have pain and swelling. East and the physician discussed possible surgery to address his bunion. MDSP Health Services authorized surgical repair of the bunion and cleared him for surgery.

In April of 2016, East underwent surgery outside of MDSP. East received post-surgical care at both MDSP and outside the prison. East's recovery appeared to be going well until May 19, 2016, when he felt a pop in his right great toe when wiggling it. MDSP Health Services made arrangements to send East to the emergency room of Avera Sacred Heart Hospital that same day, where he received treatment. PA Adams saw East on June 5, 2017, examined his toe, and ordered an x-ray of the right foot. Learning that the x-ray was negative and heeding advice to exercise more, East tried to jog on the foot and injured the foot while jogging in June of 2017. MDSP Health Services saw East after he hurt the foot jogging, issued East crutches, and when he did not improve scheduled East to see an outside podiatrist. X-rays on June 28, 2017, revealed a fractured screw holding the plate to the bone and another surgery was scheduled for July of 2017, which MDSP Health Services approved.

After the surgery, East again clashed with MDSP Health Services over not getting a personal wheelchair and instead having to use the unit's wheelchair. East points to being twice denied the use of the wheelchair when it was needed by other inmates. East also complains about not being in an air-conditioned environment postoperatively on the night of July 20 and into July 21, 2017. Although being in sweltering conditions can increase the chance of infection, East did

not contract a post-operative infection in July of 2017 in the less than 24 hours outside of an air-conditioned environment. None of this, even in the facts most favorable to East, amounts to deliberate indifference to serious medical needs.

East also has claims relating to the size of the walking boot that he received in October of 2017. MDSP Health Services did not locate a smaller walking boot for East within the Department of Corrections system and chose not to order a smaller boot because it might arrive after East no longer needed it. The existing walking boot appeared to be snug around the heel, foot, and leg, but simply long in nature. East did experience swelling around his ankle, which motivated PA Adams to order new x-rays of the right foot on October 18, 2017. The new x-rays revealed a complex fracture of East's right heel.

East again was given appropriate medical care, being transferred to the emergency room of Avera Sacred Heart Hospital and having his foot casted anew. The heel bone fracture healed well, and East transferred to a medium-sized walking cast boot and then to a regular shoe.

Without doubt, East has been through an odyssey of medical issues regarding his right foot. A careful review of the treatment, taken in the light most favorable to East, reveals that he received timely treatment and multiple referrals to outside medical providers and emergency departments when appropriate. No one working for MDSP Health Services was deliberately indifferent to East's serious medical needs. East certainly wanted greater accommodation, including his own wheelchair and a different walking boot, but such matters or disagreement over medical care do not establish deliberate indifference to serious medical needs. Langford, 614 F.3d at 460. Because East was not subjected to deliberate indifference concerning his serious medical needs at MDSP as a matter of law, Warden Dooley, Unit Coordinator Foley and PA Hanvey are entitled to summary judgment. Those defendants are entitled to summary judgment on qualified immunity

grounds because the facts, viewed in the light most favorable to East, fail to demonstrate the deprivation of a constitutional or statutory right under the first prong of the qualified immunity analysis. See Walton, 752 F.3d at 1116.

## 2. Claim as to PA Adams

PA Adams has filed a motion to dismiss, so the Court must take the facts as to PA Adams from the well-pleaded allegations of the most recent complaint. There are two principal factual allegations in the most recent complaint pertaining to PA Adams. East's latest complaint alleges that PA Adams, a physician assistant employed at MDSP, saw East in May of 2017, and that

> Plaintiff began to experience significant pain in his right foot. Plaintiff thought he detected something protruding from the side of his foot. Plaintiff was examined by physician assistant Bradley Adams, but no further treatment was ordered.[22]

Doc. 47 at ¶ 59. East only again mentions PA Adams in factual allegations by averring that "[o]n October 18, 2017, Plaintiff was informed by Adams that his right ankle was sprained." Doc. 47 at ¶ 73.[23]

East's allegations against PA Adams are insufficient to establish deliberate indifference to serious medical needs sufficient to survive the motion to dismiss. To plead a viable claim for deliberate indifference, a plaintiff must demonstrate "more than negligence, more even than gross negligence." Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995)). A viable claim of deliberate indifference to serious

---

[22] This Court must take the allegations in the complaint as true when ruling on PA Adams's motion to dismiss. However, this allegation appears to be factually mistaken. PA Adams indeed saw East on June 5, 2017, when East reported some pain over a lump near the incision site. Doc. 86 at ¶ 74. PA Adams examined the toe, found a slight prominent lump that was slightly tender to palpation, and noted that the toe was starting to deviate over the second toe. PA Adams then ordered an x-ray of the right foot, with plans to have East's foot surgeon review it. Doc. 86 at ¶ 75.

[23] This allegation is accurate. On October 18, 2017, PA Adams did examine East for right ankle pain, noticed generalized swelling in the ankle, and ordered x-ray of East's right foot and ankle, which revealed the diagnosis of the heel fracture. Doc. 86 at ¶¶ 120, 123–25.

medical needs has both an objective component of the serious medical need and a subjective component that the prison official knew of and deliberately disregarded that need. Id. East's contentions against PA Adams do not allege that he knew of and deliberately disregarded East's serious medical needs.

### D. Claims Against Prison Guards

The MDSP Defendants seek summary judgment on Count 5 of East's complaint because East failed to exhaust his claims that Baker and Goins threatened him with a gun and applied his belly chain too tightly. The Prison Litigation Reform Act (PLRA) requires prisoners to exhaust all "available" administrative remedies before challenging prison conditions under § 1983. 42 U.S.C. § 1997e(a). A prisoner properly exhausts the available administrative remedies when he "complete[s] the administrative review process in accordance with the applicable procedural rules." Jones v. Bock, 549 U.S. 199, 218 (2007) (citation omitted).

East does not dispute that he failed to exhaust his administrative remedies as to his claims that Baker and Goins threatened him and secured his belly chain too tightly. Doc. 86 at ¶¶ 155, 157, 162–63; Doc. 75 at ¶¶ 6–8. Rather, he argues that he never filed any grievance about these incidents because he was afraid that Baker and Goins would retaliate against him. Doc. 87 at 11; Doc. 90 at ¶¶ 36–39. The PLRA requires exhaustion of administrative remedies, but only if those remedies are "available." Ross v. Blake, 136 S. Ct. 1850, 1858 (2016). As the Supreme Court explained in Ross, an administrative remedy is unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860. Several federal appellate courts have held that "administrative remedies are not 'available' under the PLRA where a prison official inhibits an inmate from resorting to them through serious threats of retaliation and bodily harm." Rinaldi v. United States, 904 F.3d

46

257, 267 (3d Cir. 2018) (collecting cases). Most of these courts require inmates to meet a two-part test to show that intimidation made the prison's administrative remedies unavailable.[24] Id. at 268. The inmate must show: "(1) that the threat was sufficiently serious that it would deter a reasonable inmate of ordinary firmness and fortitude from lodging a grievance and (2) that the threat actually did deter this particular inmate." Id. at 269.

East cannot meet the first prong of this test because the actions of Baker and Goins, while threatening and inappropriate, see Burton v. Livingston, 791 F.2d 97, 100 (8th Cir. 1986), would not have led a reasonable inmate to believe that the officers would retaliate against him for filing a grievance. As East tells it, Baker, when preparing East for a transport to a medical appointment, said "[d]on't try to do anything East, cause I'll go John Wayne on your ass." Doc. 90 at ¶ 34. East claims that Baker then showed him the clip of ammunition, pointed the gun toward him, and said "I will shoot you, East." Doc. 90 at ¶ 34. Baker did not mention the grievance process or say anything else suggesting that he would retaliate against East for using the available administrative remedies. Instead, Baker threatened East with violence if East tried "anything" when being transported to his medical appointment. The belly-chain incident also lacks any connection to East filing a grievance. East asserts that the belly chain Baker placed on him was tight and that when East said he could barely breathe Baker replied that the chain "should be tighter." Doc. 90 at ¶ 33. East has not offered any evidence suggesting that a reasonable inmate would interpret the belly-chain incident as a threat not to use the grievance system.

To be sure, an officer's threat need not "explicitly reference the grievance system" to satisfy the first prong of the test. McBride v. Lopez, 807 F.3d 982, 988 (9th Cir. 2015).

---

[24] Once the defendant has shown failure to exhaust, the inmate must establish that administrative remedies were not available to him. Rinaldi, 904 F.3d at 268.

Nevertheless, "there must be some basis in the record from which the district court could determine that a reasonable prisoner of ordinary firmness would have understood the prison official's actions to threaten retaliation if the prisoner chose to utilize the prison's grievance system." Id. The closest East comes to offering such a basis is his statement that he informed another inmate about Baker's threat and the belly chain and that the inmate then told East "about how other inmates had been subject to retaliation after making similar reports." Doc. 90 at ¶ 38. This hearsay statement does not give rise to a genuine issue of material fact because it does not address the sort of retaliation other inmates suffered and whether this retaliation would have been sufficiently serious to deter an inmate of ordinary firmness from filing a grievance. East has failed to establish a sufficient connection between Baker's conduct and the grievance process, and there is thus no justification for excusing his failure to exhaust administrative remedies before suing. See McBride, 807 F.3d at 988 ("There is no reason to allow inmates to avoid filing requirements on the basis of hostile interactions with guards when the interaction has no apparent relation to the use of the grievance system."). Defendants are therefore entitled to judgment as a matter of law on Count 5 of East's complaint.

III.    **Conclusion and Order**

For the reasons contained in this Opinion and Order, it is hereby

ORDERED that the Motion to Dismiss filed by PA Adams, Doc. 63, is granted, and for reasons relating to the lack of service on Nurse Osborne, the claims against PA Adams and Nurse Osborne are dismissed without prejudice. It is further

ORDERED that the Motion for Summary Judgment filed by the MDSP Defendants, Doc. 68, is granted, and because the motion is granted, the Motion for Protective Order filed by the MDSP Defendants, Doc. 77, is denied as moot. It is further

ORDERED that the Motion for Summary Judgment filed by Dr. Heisler, Doc. 106, is granted. It is further

ORDERED that the Motion for Summary Judgment filed by CCS, Doc. 117, is granted. It is finally

ORDERED that, while no motion for summary judgment has been filed by Minnehaha County, it appears that such a motion should be filed and granted. Final judgment will be withheld until such time as the claim against Minnehaha County is resolved.

DATED this _29ᵗʰ_ day of March, 2019.

BY THE COURT:

_____
ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE